Council, please be seated. Council. Please come forward. Thank you. Thank you. Good morning. May it please the court, Mark Carlin for the appellant of Caroon Dairies. This matter concerns my client Caroon Dairies' efforts to protect its interests in a product it formulated and exclusively sold for several years called California Cheese, currently sold as Caroon's California Cheese. California Cheese is a white Mediterranean-style cheese that is sold to wholesalers specializing in the Middle Eastern and Mediterranean ethnic markets. My client first manufactured this product approximately 10 years ago. My client is appealing the district court's disposal of its claims against the Apelli Courage importing company via summary judgment. At the district court level, there were two distinct sets of claims that my client was pursuing. The first set concerned my client's claims for unfair competition, trademark infringement, and unfair business practices. The second set concerned the misappropriation of trade secrets. It's my client's position that the district court improperly disregarded several tribal issues and facts in granting the Apelli's motions. I'd first like to address the area of trademark infringement, unfair competition, and unfair business practices. And most striking in that is that the court ruled in its last order that my client had not presented sufficient evidence of secondary meaning in either the name Caroon's or the name Caroon's California Cheese. But as I pointed out more explicitly, I believe, in my reply brief, the Apelli did not move the court on the motion at issue on whether my client lacked sufficient evidence of secondary meaning in the names Caroon's or Caroon's California Cheese. In fact, the term secondary meaning was not mentioned in the Apelli's original moving papers. Also, district court did not permit oral argument on my client's motion, so I could not address this, what I thought was a discrepancy or an issue with the court before it ruled on its motion. Assuming that the district court was in error in those respects, does it matter, given that there had been a prior ruling that California Cheese doesn't have secondary meaning, and the reasoning of the court appears to be that if there was no secondary meaning to California Cheese, all you're adding to that is Caroon's, and given the dissimilarity between Caroon's and Biblos, there couldn't have been customer confusion. Well, Your Honor, that raises an interesting point, and let me address that. In the one of the prior motions, the court had ruled that taking the two names, Biblos California Cheese and Caroon's California Cheese, and evaluating those names under the factors set forth in the Ninth Circuit, there was a triable issue of a likelihood of confusion. The judge had set the district court set that in a prior ruling. In that prior ruling regarding California Cheese, there was really a legal discussion of whether that was a generic term, whether it was entitled to protection, et cetera. At that time, because, again, the focus was not on secondary meaning in those moving papers, my client didn't prepare declarations which I believe would sufficiently address that, that the relevant consumers associate the names Caroon's or Caroon's California Cheese with a California Cheese product from my client. So had, Your Honor, we been noticed that this motion would primarily be decided on the issue of secondary meaning, we would have undertaken market surveys. We would have pointed our evidence gathering in that direction. To show that even though the generic term, or what the court found to be the generic term California Cheese isn't protected, that there is still confusion when you have a more discreet, in other words, you don't have any protection in California Cheese. So essentially, at least it seems to me, you're saying that there's a confusion between Caroon's and Biblos. Well, Your Honor, if I recall, the district court had ruled that as a matter of law, that was a generic term not entitled to protection. We had disagreed saying that it was an arbitrary term because California Cheese is a product that is geared towards recent immigrants to the United States who don't maybe have the association that we would have or people who are native Californians or native. No, I understand that. I don't have any problem with that, but the law of the case is that California Cheese isn't entitled to protection. Correct. So what you're protecting is California Cheese plus, the plus being Caroon's and saying that customers are likely to be confused by a similarity between Caroon's and Biblos. And there's nothing in the record suggesting that, whether it be in Middle Eastern culture or otherwise, that there's any confusion between Caroon's and Biblos. The confusion still gets back to California Cheese. I understand that, Your Honor. We had respectfully disagreed with the district court on that on legal grounds. We had also produced evidence that we thought was direct confusion of consumer returning a product that was trying to be Biblos and returning to us saying, well, we thought this came from Caroon. So I understand that. We don't agree with the district court's ruling that the term California Cheese itself is purely arbitrary. But we're stuck with that because you didn't appeal that, right? Well, if the court was going to utilize that ruling in its final ruling of summary judgment, then I believe the record, we do have a full record of disagreeing with the district court. But there's not really, that's not the issue that I understand is being put before us. I mean, you could, certainly you're free to appeal that issue and could have done it here. Right. But I don't find that here. So if you, maybe, but you didn't. Well, I understand, Your Honor, because the name as we sell the product is Caroon's California Cheese. That's how the name, that is how it is sold to the consumer. But as I said, had we, the judge said to us, I'll never find, there'll never be secondary meaning, there'll never be trademark infringement on anything to do with California Cheese, no matter what name she would fix to the front or back, that might have been different. That was in our reading of the district court's prior rulings. She also had said that she wanted us to produce evidence showing that consumers associate the name California Cheese, not necessarily with the cheese made in California, but with a Middle Eastern, white, Middle Eastern style of cheese. And we did that. Well, take the issue as if it were arbitrary rather than descriptive and you didn't need a secondary. Correct, Your Honor. Tell us why you would prevail under that. That it would be arbitrary, Your Honor? If it were arbitrary, not a descriptive name. We would prevail, Your Honor, because we would be able to, we would, if noticed on that. Then you wouldn't have to show secondary meaning, right? Correct. Okay. And why shouldn't the district court's ruling be affirmed on the ground that whether or not there's a secondary meaning, you lose? In the sense that because we can't, we can never prove secondary meaning or that it's generic, Your Honor, that the term is descriptive and not entitled. There's no confusion. Well, we did present, we believe, circumstantial and direct evidence, Your Honor, of the likelihood of confusion using the factors set forth by the district court. That there was one customer who returned the cheese to you. Correct, Your Honor. And what else do you have that prevents the court from looking at the names, applying the sleek craft factors and saying, you lose? Your Honor, we had presented evidence of the amount of exclusively the time we had sold the product, the advertising, that both my client and the appellee are marketing an extremely similar product to the exact same market, which the court noted in its prior ruling. And based on those factors, the court had previously ruled, which we agreed with, that there was a tribal issue of likelihood of confusion. So in addition to the one piece of direct evidence, we also, again, presented several items of circumstantial evidence using those factors. And we agreed with the district court's prior ruling that there was a Well, you keep going back to that prior ruling, but unfortunately the district court didn't wind up there. No, it didn't. And one of the things that I regret is I didn't get a chance to discuss that with the district court at oral argument, why it had changed in two months from saying, you know, applying the factors regarding tribal issues. The posture of the case in front of us is really, as Judge Fogle suggests, we've got these two names that if you extract California or don't focus on California, and maybe you can properly say we should pay more attention to California, but the family type names don't seem very similar. Right. So where's the likelihood of confusion? Your Honor, as I understand the law, as I read it, you're supposed to look at the trademark name or the name in its entirety. And looking at its entirety, we believe we presented direct evidence and also circumstantial of a likelihood of confusion, at least a tribal issue of fact raised to those issues. So if you look at it in its entirety, there is tribal issues of fact on those areas. Finally, I'd like to address the issue of trade secrets, misappropriation that district court had previously ruled that because the appellee's representative did not profess, he professed he didn't know the actual recipe and issue that he couldn't be held for misappropriation of trade secrets, even though we had sent him notice, or my client and my office had sent him notice, that he was distributing a product that we believed had been manufactured with a misappropriated trade secret. That's an interesting concept. And, you know, up where I sit, we get a lot of this kind of stuff. Let's say somebody sends a letter to Safeway and says, you know, you're distributing a product that contains a trade secret that was misappropriated, and that's all they get. Does Safeway have to take the product off the shelf? Well, at least do something, Your Honor. And this, I think, is a little bit different since we're talking about a very specific market niche, a very specific area, and there was follow-up. It wasn't just a letter from some lawyer. There was also follow-up between our client and the appellee, who know each other. It's a very insular, tight community here in Southern California in this business, and said, look, this person who you're buying the product from is manufacturing it based on a misappropriation. We're suing them in district court right now, as a matter of fact. So it's a little bit more than that. They actually said, we're pursuing a federal case against this manufacturer. But they don't know the merits. Crajan doesn't know the merits. Correct. They're just getting a letter saying that you've got a beef with the manufacturer. Do they have to stop selling the product while you resolve that? I mean, there's without evidence that they themselves are in pari delicto or that they know the recipe. How is it commercially reasonable to require that of them? In this small market, we believe the facts were appropriate. The facts support our position that it was appropriate that they stop. Well, what? Why? I mean, as Judge Fogle said, Safeway gets a letter from Pepsi-Cola or Coca-Cola saying Pepsi-Cola has stolen our formula. Don't sell any Pepsi-Cola. I would think Safeway would wait till, as you say, you've got a case against them. They'd wait till Pepsi-Cola and Coca-Cola resolved this in court. How can they make that decision?  But in our case, being that it's a small market and that the knowledge, I think there was more knowledge on behalf of the appellate. But they still have to make a judgment. The two sides are litigating it in district court. They have to decide that you're right and the other side is wrong. The other side would say to them, look, why are you refusing to distribute our product? We're litigating this in court. They're lying to you. As we read the California Civil Procedure Code or the civil code at issue, there's a tribal issue of fact in our case, whether the appellee was using the product. It may not be. At the end, when it's finally adjudicated, he may have found not to be using the product. But we believe it was a tribal issue. Well, he may be using it. But if he doesn't know that he's using it, other than the fact that you claim he's using it. I mean, they're really two separate issues. You know, one is, is it enough that he doesn't know and he's just using it? He doesn't know the recipe or the formula. And in there, I can see practically that if he really knew that he was distributing it, I think there's certainly a decent policy argument. What's the law is I'm not so sure. But and maybe this isn't quite the right remedy. Maybe there are other causes of action. But in any event, we've been inquiring into is not so much if he does know. But what kind of knowledge does he have to have? I mean, we can assume for the moment that if he knew he was distributing a product that had been stolen, he would be liable. But if somebody says it's stolen and the person he bought it from says that's not true, I'm in court. And I'm going to prove it wasn't. Then the question, that's really the question that we were talking about, why is he obligated to believe one side rather than the other before the court decides? Your Honor, I believe there's a case we said in our reply brief that at least there's a tribal issue and one has knowledge of that he is perpetuating a misappropriated product, that he or she can personally be found or be held liable. And we believe that's a knowledge issue. Well, what evidence is there that Crajan had such knowledge other than the letter that was sent to them that simply said we have a dispute? Also his discussion with my client, which my client put forth that declaration to the district court. And the substance of which was? This person. He gave very explicit detail that this person has misappropriated our trade secret. You're selling it. We're, and I'm paraphrasing, you're selling it. We're suing this person. But that's still the belief of your client. Correct. It's not independent evidence from which Crajan knew or should have known that it was misappropriating a trade secret. But that's, you see the distinction I'm making? The problem is, let's say that, as I think is the case here, Crajan had a distribution contract. They would have breached that contract if they had stopped distributing the product. So the only way they're on the hook is if somehow they know that what they're doing is wrong. And the only evidence that you've offered as to how they know that is that your client told them. Right. Well, that's the evidence, you know, we have. That's the only part of the record. I see that I'm almost out of time. I'll save, reserve the rest of my time for rebuttal. Thank you. Thank you, counsel. Good morning, Your Honors. Just briefly. First, the court's rulings were correct and should be affirmed. With respect to the trademark issue, it's the law of the case that California cheese is not protectable. It's generic. It's also widely used by various companies to designate descriptively the origin of cheese. Is there something in the record that shows that there are lots of companies that use California cheese to describe their products? Well, there is the California Cheese Commission in connection with the ruling of the district court. It was brought to the attention of the court and should be part of the record that the California Cheese Commission uses the phrase California. I know, but you said there are lots of companies. Yes. California cheese. Yes. Yes. Meaning that the California Cheese Commission approves for usage by various companies the phrase California cheese. And they have approved that term for usage by lots of companies. They have authorized the use of the term by various companies. That doesn't refer to the product we're talking about here. That's geographical. That's generally.  Yes, that's right. It's the TV commercials, Your Honor. But I'm still trying to find out what you started out with is lots of companies are using the term California cheese. Yes. So far. Well, there are two of them are before us. Yes. Well, what are the others? Well, my my mention or my reference, my intent in that regard was that the California Cheese Commission, Your Honor, runs that happy cow commercial. And I don't want to get sidetracked on it. But they have various companies using the phrase California cheese to denote cheese made in California as a descriptive phrase. I don't know whether Your Honor has seen that commercial. No. You missed something. It's a cute commercial, Your Honor, if you haven't seen it. But in any event, California cheese is generic and not protectable. With respect to the phrase Caroon California versus Piblos, as the court correctly observed, the words have substantial dissimilarity. It's like almost Coca-Cola suing Pepsi-Cola. They're just different words with different connotations. There's no basis for finding a likelihood of confusion. Additionally, we believe that the finding of no secondary meaning is very well deserved, given the fact that the indications were that the term California cheese, to the extent it described anything, and described a type of cheese, and even with respect to Caroon California cheese, the declaration suggested that it was identifying a type of cheese, namely a white cheese popular in a certain sub-community and not designating a certain company as the point of origin or source. Accordingly, we believe that the trademark finding is clearly correct. There's no likelihood of confusion. The names are clearly different. And furthermore, there is no secondary meaning shown. In fact, it's negated by the declarations. With respect to the trade secret issue, Your Honor, essentially, as the court has observed, there's no evidence showing. In fact, the evidence negates any knowledge and use of a trade secret by a client. The only evidence that had been offered in that regard was the suggestion that counsel for the other side had informed the client that they had a claim. But certainly that kind of letter-from-attorney-type communication can't be used to freeze commerce nor to bring this within the purview of the trade secret statute. Accordingly, we believe the... But it's your position that even if you knew it, it wouldn't be a violation. Isn't that right? That's my understanding, Your Honor, that unless there's a use, mere knowledge wouldn't be sufficient. Mere knowledge... Knowledge, unless they knew the actual recipe. Yes. If knowing that the manufacturer had stolen your – stolen their formula and was using it, you would be able to distribute that without – at least without violating the statute. That's my understanding, Your Honor. It might be a different claim, though. Yeah. Perhaps under the circumstances, but dealing with our case here, it would be my understanding... Have you found any case in which the court has said... Now, I know courts have given definitions which sometimes might seem to exclude that, although there's at least one case where it would appear to cover it. But I didn't see any cases in which anyone had ever brought a claim on the theory that that was enough to show a violation, that a company knowingly distributed a stolen recipe. Are there any cases either way on that issue? I'm not aware of any, Your Honor. We believe the language of the statute as applied by district court is clear, that the mere knowledge, even if that were present, that the producer of the product was misusing a trade secret would not be enough to make the distributor liable here under the statute. Let me give you a scenario. Yes. Suppose I got an envelope, and inside the envelope is the formula for Coke, Coca-Cola. And I go to some bottler and say, here's this envelope. I've never looked inside, but I want you to make this stuff and sell it to me, and I'm going to sell it big time. Can somebody avoid liability for misappropriation simply by keeping the information inside the envelope? Because he can't use it anyway. He can't make Coke, and potentially your client can't make cheese. But if you get the information to the person that can make cheese, can you be liable for it? Well, that's a tough call, isn't it? Because, and that's probably why you all are so empathetically on it. That's why I asked the question. Because it might seem to honor form over substance to say there could never be liability as long as you keep the information. Isn't that what law is about? Sometimes I think that's where they coincide. You ever been reading Supreme Court? Because here I think both substantively we don't have the recipe in the envelope and also in terms of the form of the proceeding, all we really are and all we're really shown to be is something that's purchasing and reselling product like the court's example of the Safeway stores. And so that wouldn't be enough under the statute, under any case law that's been cited. I understand your desire to move back to the facts you think apply to this situation. But in terms of what the statute can cover, I mean, I think that gives us a somewhat harder challenge because that makes this more of a factual than a legal determination and factual determinations are trickier on summary judgment. Well, let me put it this way. I think being fair and taking your example of the formula inside the envelope, then I might ask myself, well, can you say that this recipient of the envelope in effect knew the recipe even if he hadn't committed it to memory because he has the recipe in the envelope. And so it's got this kind of custodial possession of the recipe and you almost want to say maybe it should be imputed to the person such that if he then goes out and gives it to the distributor and says, Kevin, look at the envelope. It's like the Oscars. I'm going to pass it off. Just use it. But I see that as a great divide from what we have here because truly all we have here is a claim being presented by a business competitor through its counsel. But the legal question that Quifton is pursuing. Yes. This California case of Kadesha says, employing the confidential information in manufacturing, production, research, or developing marketing goods that embody the trade secret or soliciting customers all constitute use. You can certainly read that sentence in the normal reading would seem to be marketing goods that embody the trade secret constitutes use. Now, then it goes on to say, but if you use it without knowledge, it was acquired by improper means. It doesn't subject you to liability unless you get noticed that it's wrongful. That to me would seem to suggest that there's at least a theory that may or may not be correct. The California court has advertently or not advanced that its use would include distributing material that has trade secrets in it. And that's why I do it. That's not the way it's usually described in the cases. But in at least that one case, it certainly suggests that that might be a violation. And I couldn't find a case that dealt with the issue directly. Yeah. And the short answer is I'm not aware of a case that does deal with it directly. The somewhat longer answer is, I think, twofold. Number one, there's an absence of authority to extend the statute to a scenario such as that here, which is not the recipe and the envelope being presented to the distributor, but essentially just somebody in the chain of commerce who gets this claim being presented by a business competitor that we don't like or we have questions about the origin of the cheese. And also, as the court did, looking at the statute, it certainly would appear to me on my reading. A literal reading of the statute would support your position. Yes. But there are statutes that are read broadly. And by the time the courts get through with statutes, you might not recognize the original literal language. That's. Well, my thinking at least would be that when, A, the literal language of the statute supports a conclusion, when, B, it seems consistent with the spirit or intent of the statute, which I believe is true here, and when, C, trying to give the statute some other reading kind of creates an unintended hornet's nest, as it could here, because then you'd be making the Safeways and the other people in the chain of distribution potentially at risk or liable if they get in the letter from the competitor saying, you know, how dare you sell this product? Don't you know that one or two steps up the chain? It was made by somebody who's a real rascal. I don't think that's the right policy position. I don't see a case law for it. And I think it's it's it's contrary to at least the language. I think the spirit of the statute. What does it mean that use of a trade secret without knowledge? It was required by improper means. Does not subject a person to liability unless you receive notice. If you didn't know, know that it was acquired by improper means and somebody tells you it was, is that enough? Don't you have the exact same problem? Yeah, I think so, because at least it's my perspective. But I think the mere fact somebody tells you something doesn't make it true. The mere fact that there's a claim or complaint does not make it a reality. So I don't think the fact that a somebody who's a business competitor and may have his own reasons says, I don't like you selling the cheese. I think that the person up the chain acquired it by improper means is sufficient to show that you have a knowledge or a well-founded belief that there's something wrong going on here. I mean, it's a claim that's being asserted, right? It's not like my client is, you know, here's the testimony of a worker who's there at the manufacturing plant and says my client's there and they're talking about how it would be fun to use this cheese recipe or something. It's not real evidence of knowledge of a purloined good. It's somebody's asserting something. Wouldn't that be more of a factual question? Well, I think you have to have some facts to get past go, even if that's the theory. And under Sellotex, right, we say, you know, here's my client, my client's testimony. I don't know of any cheese recipe. I don't know of any cheese secrets. I don't deal with this Los Sarcos or whatever the one was that you thought was up to no good. Well, you say you don't deal with it. You mean you have no direct, you get it through them in a chain? Is that it? Well, no, actually, Your Honor. My understanding is the accusation as originally presented was that the bad dairy, as it were, is a company called Los Altos. Yes. And my client presented a declaration that it's never dealt with Los Altos and also a declaration from Los Altos that it's never sold to my client. Well, that's what I'm asking. Is there a middleman? No, it's my understanding we just deal with a different dairy. We haven't dealt with that subject dairy. So I thought Los Altos manufactured the cheeses from both. I don't believe that to be the case, Your Honor. I believe that as to my client, it's a different dairy supplier. And I could double-check, but I believe it's that. They're not in any chain at all. They're not in a chain of distribution. It's not all from Los Altos. It's not dealing with Los Altos at all. My client is saying, I don't know anything about cheese recipes in my declaration. I don't know anything about death-to-cheese recipes. I don't deal with the dairy that you said is the problem dairy. There's no problem here. And so even if you were to indulge and say maybe under certain circumstance, let's assume that if they knew there was something wrong, there could be liability. Here's my client's declaration. There is this Altos declaration. They never dealt with anybody, each other, pardon me. The ball is back in the other side's court to show where is the knowledge? Where is the evidence that's sufficient to meet something that's part of your prima facie burden of proof in even your strained attempt to read the statute to apply here? Where is the evidence of knowledge? And then they say, well, the evidence of knowledge is we told you so, right? We told you that your supplier, although we actually had different dairy in mind, is up to no good. And my response to that would be even under the theory that the claim could be asserted, that's not enough to meet a burden under sellotext, that a letter from an attorney suggesting that they don't like this dairy or that they may be up to something wrong is not enough to mean that we have knowledge of theft of trade secrets. So even if we're walking down that road, Your Honor, and please understand, I don't – I think it's more analysis and exercise and understanding we're engaged in rather than accepting that theory, it's still not enough. Thank you. Thank you, Your Honor. Just a few quick points back on the trade secrets issue. In Exhibit 18 to the Supplemental Exhibit Record is a pretty detailed declaration by my client dealing with the underlying claim of trade secrets that the product at issue that was allegedly misappropriated was manufactured by a certain plant. Those plants are all given numbers. By the California Milk Bureau, the product at issue that my client saw being distributed by the appellee came from that plant. There were repeated discussions with the appellee's representative about his selling product from that plant. So to us, this is a summary judgment. It's a triable issue as a fact as to use. Coming to another issue Your Honor had brought up about the name Real California Cheese, which was the subject of one of the motions in this case. That is a certification mark which is issued by the California Milk Advisory Board. And the district court ruled that the Real California Cheese certification mark really wasn't at issue in this case and really has no bearing. So there are products which have the name Real California Cheese on them, but that's just a certification mark by a government agency. But doesn't it suggest it's difficult to build a case for confusion focusing on California? Because the phrase California Cheese in some context is widely used by lots of other products. Well, it's not necessarily used. This is where I disagree with the district court. It's not necessarily used by products. It's really an advertising or marketing tool. That's not the name of the product. Well, in this case, that name is one of the components of the name of my client's product. And district court was very clear that that's a certification mark. It's something that's put on the side of a product. It's not the name of the product. It's not dispositive of any issue in this case. So we didn't address that in our brief because the district court said it wasn't an issue. One final point I want to make, Your Honor, and dealt with the issue of generic-ness of the name California Cheese, the trial court, the district court did rule that if my client presented evidence that the relevant consumers associate the name Caroon's California Cheese or California Cheese with a Middle Eastern, white Middle Eastern cheese rather than a cheese brand in California, we would rebut the presumption, at least for summary judgment, that the name California Cheese was generic. And that I have nothing further more to submit on my end. Was there such evidence submitted? Yes, Your Honor. There were several declarations, and they're towards the end of the supplemental excerpts of record. Thank you. Thank you, counsel. Thank you. The case just argued will be submitted. The next case on the calendar is ProVan Limited v. Pfizer. Good morning, counsel. Good morning, counsel. Good morning, counsel.
judges: Reinhardt, Clifton, Fogel